# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **BRYANT LEDET** | * | **CIVIL NO. 07-0683** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **NORTHLAND INSURANCE CO., ET AL.** | * | **MAGISTRATE JUDGE HILL** |

## FINDINGS AND REPORT AND RECOMMENDATION ON MOTION TO ENFORCE SETTLEMENT AGREEMENT

Before the court is the Motion to Enforce Settlement filed by defendants Rickey Boatner, Sr., d/b/a Boatners Transport, Southern County Mutual Insurance Company, and Northland Insurance Company (hereinafter "Boatner") on February 3, 2009. [rec. doc. 35]. On March 27, 2009, plaintiff filed an Opposition to the Motion. [rec. doc. 55]. On March 30, 2009, defendants filed a Supplemental Brief in Support of the Motion. [rec. doc. 58]. An evidentiary hearing was held before the undersigned Magistrate Judge on April 22, 2009, and the matter was taken under advisement. [rec. doc. 69]. For the following reasons, it is recommended that the motion be **GRANTED**.

### FINDINGS AND CONCLUSIONS

*Background*

Boatner alleges that it entered into a settlement agreement with plaintiff Bryant Ledet (hereinafter "Ledet"), through his counsel of record, Jim Gates (hereinafter "Gates"), on January 14, 2009. Boatner's counsel, Janice M. Reeves (hereinafter "Reeves"), understood that Gates had met at length with Ledet about his case and that

...

Ledet had accepted Boatner's offer of settlement. The agreement called for Ledet to dismiss his claim and the lawsuit against all defendants in exchange for the payment of the total lump sum of $75,000.00.

The agreement to settle was reduced to writing and signed by counsel of record for both parties on January 15, 2009. A copy of that settlement letter is attached as Exhibit "A" to Boatner's motion. Thereafter, also on January 15, 2009, Gates sent a letter to Reeves guaranteeing that all medical liens would be paid out of the settlement proceeds.[1] Gates also sent a letter to the Court on January 15th advising that the case was settled.[2] On January 20, 2009, Reeves transmitted a settlement check for $75,000.00 made payable to Gates and Ledet along with a Receipt, Release and Indemnity Agreement and Motion and Order of Dismissal.[3] On the same day, Reeves also sent a letter to the Court advising that the case had been settled.[4] A 60-day Order Of Dismissal was entered accordingly on January 22, 2009. [rec. doc. 34].

Counsel for plaintiff never returned the signed Receipt, Release and Indemnity Agreement nor the Motion and Order of Dismissal. Defense counsel filed its Motion to Enforce on February 3, 2009. [rec. doc. 35]. Gates then sent a letter to Reeves on February 10, 2009, wherein he stated that "[m]y position was - and is - that we settled

---

[1] Copy of letter is attached to instant motion as Exhibit "B."

[2] Copy of letter is attached to instant motion as Exhibit "C."

[3] Copy of these documents attached to instant motion as Exhibit "D."

[4] Letter is attached to instant motion as Exhibit "E."

Bryant Ledet's case, as indicated in your *Motion To Enforce Settlement* (emphasis in original)."[5] On February 23, 2009, Gates sent a letter to the undersigned stating in part that "[m]y settlement of this case was accomplished after consultation with my client. In twenty-three plus years of practice, I have yet to be in this situation and can only represent to the Court those facts which are true. . . . I further wish to make clear that my continued representation of [Ledet] is not precluded, should he change his mind and decide to honor the settlement agreement which he gave me the authority to consummate."[6]

Plaintiff, *pro se*, filed a deficient Motion of Reinstatement of All Claims on February 19, 2009. [rec. doc. 38]. On March 31, 2009, plaintiff's Motion to Substitute Attorney was granted by the undersigned; Gates was officially terminated, and new plaintiff's counsel Jacob Bryan Fusilier and J. Wendel Fusilier were added. [rec. doc. 65]. The sole issue presented by this motion is whether or not Gates had the requisite authority from Ledet to agree to the settlement as set forth in the letters exchanged between counsel.[7]

### *Evidentiary Hearing*

Three witnesses testified at the evidentiary hearing: Bryant Ledet, James Steven Gates, and Janice Marie Reeves. Various exhibits, including copies of emails and the letters exchanged by counsel, were introduced at the hearing.

---

[5] Copy of letter is attached to instant motion as Exhibit "G."

[6] Copy of letter is attached to instant motion as Exhibit "H."

[7] Ledet acknowledged at the Evidentiary Hearing that the writings were sufficient under Louisiana law.

Ledet testified that he went to Gates' office on the night of January 12, 2009, to discuss several legal matters. Ledet testified that he and Gates had "a few" beers, perhaps as many as three or more. In addition to discussing making an offer to settle this case, Ledet and Gates discussed certain criminal charges against Ledet which were pending. These included battery, identity theft and insurance fraud. Ledet testified that because the discussion of the then pending criminal charges made him nervous, he agreed that Gates should make an offer to Reeves to settle the case for $100,000.

Ledet testified that he was "not happy" with the $100,000 figure, and that "since I had been drinking a lot" he had "very little" understanding of what was occurring. Ledet confirmed that Gates composed an e-mail to Reeves that night; Ledet also remembers talking to Reeves on Gates' speakerphone.

Ledet testified that he called Gates the next day and told him, Gates, that he was unhappy with the $100,000 offer. Ledet testified that he did not remember Gates asking him, Ledet, to go to Gates' office that day. Similarly, Ledet testified that he did not recall going to Gates' office that night, nor talking to Reeves again on the telephone. Ledet testified that he did remember some discussion about "overnighting" the settlement proceeds.

Ledet testified that he first learned about the $75,000 settlement agreement when he received a copy of the confirmation letter. Ledet testified that he was "furious." Ledet said that he went to Gates's office on the following Monday, picked up his file, and then

called Reeves to tell her that he was firing Gates. Ledet confirmed that Reeves refused to talk to him because she believed that he was still represented by Gates. That week, Ledet told Gates that his, Ledet's, brother had said that he should not settle the case for $100,000; Ledet said that Gates told him that he, Gates, could not "undo" the settlement agreement.

Ledet denied ever agreeing to settle the case for $100,000, much less $75,000, and said that the beer that he had drunk with Gates "affected his ability to understand" what Gates told him.

Gates testified that he called Ledet and arranged a meeting with Ledet on January 12, at 7:00 p.m. Gates testified that he and Ledet discussed Ledet's case for an hour or two, and they decided to make a settlement offer of $100,000. Ledet verbally consented to making the settlement offer, and he sat next to Gates and watched Gates write the e-mail to Reeves offering to settle the case for that amount. Gates denied that he or Ledet had anything to drink at Gates' office that night.

The next day, Reeves called Gates and offered to settle the case for $75,000; she indicated that this was the maximum amount that was going to be available for settlement. Gates then called Ledet to arrange a meeting for that night to discuss the counter-offer. Gates testified that Ledet, again, arrived at his office about 7:00 p.m. Gates said that he and Ledet discussed the $75,000 counter-offer for a long time. Gates informed Ledet that

Reeves had said that this amount was the final offer, and that no further offer would be made.

Gates recommended that Ledet accept the offer. Gates made his recommendation to Ledet, in part, because of the pending criminal charges, especially considering incriminating testimony which Ledet had given in his deposition which, if made at trial, could be used against Ledet in the pending criminal prosecutions. Gates testified that, after much discussion with Ledet, Ledet told Gates to "go ahead and settle."

With Ledet still in the office, Gates called Reeves on her cell phone and confirmed the agreement to accept the $75,000 in full settlement of Ledet's claims. Gates testified that he believed that Ledet spoke to Reeves during a telephone call. Gates testified that after he hung up the telephone, and with Ledet still in his office, he dictated the letter to Reeves confirming the acceptance of the $75,000 offer. Gates testified that he and Ledet then walked into the kitchen at the office and each drank one beer. Gates was adamant that at no time during that telephone call, or later in the evening, did Ledet ever say that he had changed his mind about accepting the $75,000 settlement offer

Gates said that on Friday, January 16, Ledet called and said that he was having doubts about the settlement. On Monday, January 19, Gates testified that Ledet went to his office and said that he was not comfortable with the settlement and would not sign any settlement documents. Gates testified that Ledet contacted him several times during that week asking him to "undo the settlement." Gates testified that he told Ledet that he could not file pleadings, ethically, to "undo" the settlement, and that he, Ledet, would have to

retain different counsel in order to challenge the settlement agreement. Thereafter, on Friday, January 23, Ledet picked up his file from Gates' office, indicating to Gates that he was trying to find a lawyer to challenge the settlement agreement.

Reeves testified that she received a telephone call from Gates and Ledet on January 12, 2009, during which an offer to settle Ledet's case for $100,000 was made. Reeves testified that she knew that Ledet was on the speakerphone because he said hello to her. Reeves testified that she told Gates and Ledet that she had no authority to settle, and that she would call back the next day. After talking to her client, Reeves said that she called Gates' office the next morning and offered to settle the case for $75,000. Gates informed her that he would talk to Ledet that night and thereafter call her with a response to her offer.

Reeves testified that Gates called her back sometime after 8:00 p.m. that night, again using a speakerphone, and told her that he and Ledet, after another very long conversation, agreed to accept the $75,000 offer. Gates told Reeves that Ledet was in the office at that time and was participating in the telephone call. Reeves said that she heard someone in the background, but she could not recall what exactly was said; Reeves could not identify Ledet as the person that she had heard in the "background." Gates wanted to know how fast he could receive the settlement proceeds, and Reeves told him that she would overnight the check and settlement documents to him within three or four days.

Reeves testified that Ledet called her directly, later that week, and told her that he needed more money to settle. Reeves testified that she told Ledet that she could not talk to him since he was represented by counsel, and she hung up the telephone. Immediately thereafter, Reeves called Gates to tell him of Ledet's call, and to ask the status of the settlement. Gates told Reeves that Ledet had been talking about his case with some of his friends, who were on disability, and that they had advised him, Ledet, that he should get more than $75,000 for his case. Reeves testified that Gates characterized Ledet as having "buyers' remorse." A few days later, Reeves testified that it became apparent that Ledet was not going to honor the settlement agreement, and she prepared the motion to enforce the settlement.

Considering the exhibits, testimony and the demeanor of all the witnesses, the undersigned finds the testimony of Gates and Reeves to be credible and the testimony of Ledet to be not credible. The undersigned finds that the Ledet participated in both telephone calls with Reeves and knowingly and voluntarily authorized Gates to offer to settle his case for $100,000, and to accept Reeves' counter-offer of $75,000. This is clear from the testimony of Reeves, that, on both telephone calls by speakerphone, two parties were present on the other end of the line, and the testimony of Ledet himself who acknowledged that something was said during the one telephone call in which he acknowledged participating about "overnighting" the settlement proceeds. The statement about overnighting the settlement check was not made until after the settlement had been

agreed to. Accordingly, Ledet must have been present, and then able to hear Gates and Reeves consummate the settlement for $75,000. There was no objection expressed by Ledet at that time.

This testimony is consistent with Ledet authorizing Gates to accept the $75,000 offer of Reeves, and it supports the finding of the undersigned in that regard. Ledet's testimony that he did not understand what was going on because he had three "or more" beers is completely self-serving, uncorroborated and frankly unbelievable. The undersigned gives no weight to that testimony.

It is apparent to the undersigned that Ledet, after talking to some other persons, apparently had second thoughts and tried to "undo" the settlement to which he had earlier agreed. By that time, however, the letters between counsel, which are clearly legally sufficient to bind the settlement, had been exchanged. In short, when Ledet tried to withdraw his consent, the settlement had already been agreed to and was binding on him.

### *Analysis*

The district court has jurisdiction over the settlement because the settlement is the final adjudication between the parties of the claims involved in the case. *White Farm Equipment Co. v. Kupcho*, 792 F.2d 526, 529 (5th Cir.1986). In *White,* the Fifth Circuit held:

> "Whether it is a valid contract between the parties is determined by reference to state substantive law governing contracts generally. . . . Federal courts have the inherent power to enforce settlement agreements entered into by the parties litigant

in a pending case, to determine compliance with procedural prerequisites, and to determine when, if ever, a party may repudiate a contractually binding settlement agreement." *Id.*

In their Motion, defendants correctly state that for a settlement agreement to be valid and enforceable under Louisiana law, it must either be recited in open court and capable of being transcribed from the record or be in writing and signed by the parties *or their agents* (emphasis added). *See La. Civ. Code Art. 3072.* In this case, there is a written agreement signed by counsel for both parties evidencing the mutual intent to settle the case for the lump sum of $75,000.00. As described above, there are several letters written by counsel for both parties after the settlement agreement was signed which are evidence that a settlement agreement was executed. *See Harvey Ford v. Tomasevic, 979 So. 2d 521 (La. App. 3rd Cir. 2008).*

At the Evidentiary Hearing on this Motion to Enforce, attorneys for all parties agreed on the record that the settlement agreement at issue is a valid written contract under Louisiana law.

Thus, the only issue is whether plaintiff authorized his attorney to settle the case for $75,000.00. Whether the plaintiff actually agreed to the terms of the settlement is a factual issue. As such, the plaintiff, Ledet, bears the burden of proof since he seeks to nullify the settlement agreement. *City of Baton Rouge v. Douglas*, 984 So. 2d 746 (La. App. 1st Cir. 2008). Louisiana law strongly favors a compromise agreement between the parties. *Id.* As to Ledet's claim that he never expressly authorized Gates, his attorney at

that time, to settle the case for $75,000.00,[8] the overwhelming weight of the evidence is directly to the contrary.

For the reasons set out above, the undersigned finds, *as fact*, that Gates was authorized to act as attorney and agent for plaintiff in this matter with regard to the $75,000.00 settlement. The sworn testimony of Reeves, Gates and Ledet make it clear to the undersigned that Ledet was an active participant the in the ongoing settlement negotiations leading up to, and including the agreement to settle.

Thus, the undersigned concludes that the evidence presented at the Evidentiary Hearing conclusively shows that Ledet authorized the settlement and that Gates had Ledet's authority to settle the case for $75,000.00.

*Conclusion*

For the foregoing reasons, **IT IS RECOMMENDED** that defendants' motion to enforce settlement be **GRANTED.**

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have ten (10) days from receipt of this Report and Recommendation to file specific, written objections with the Clerk of Court. Counsel are directed to furnish a courtesy copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this report and recommendation within ten**

---

[8] *See* Plaintiff's Opposition brief at p. 2. [rec. doc. 55].

**(10) days from the date of its service, or within the time frame authorized by Fed.R.Civ. P. 6(b), shall bar an aggrieved party from attacking the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See <u>Douglass v. United Services Automobile Association</u>, 79 F.3d 1415 (5th Cir. 1996).**

Signed at Lafayette, Louisiana, on July 2, 2009.

*/s/ C. Michael Hill*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE